**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENISE GUY, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| SANOFI-AVENTIS U.S. LLC, SANOFI US SERVICES INC., CHATTEM, INC., and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Denise Guy, on behalf of herself and all others similarly situated, in her action against Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants"), and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") alleges the following based on personal knowledge, the investigation of counsel, and information and belief.

## INTRODUCTION

1.      This case is brought as a class action lawsuit regarding Defendants' manufacturing, distribution, and sale of ranitidine-based over-the-counter medications under the brand name Zantac that contain dangerously high levels of N-nitrosodimethylamine ("NDMA"), a carcinogen.

## FACTS COMMON TO THE CLAIMS

2.      Zantac is used to treat gastrointestinal conditions such as acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.[1]  Zantac was first sold in the United States in

---

[1] *Ranitidine hydrochloride – Drug Summary*, PRESCRIBER'S DIGITAL REFERENCE (last visited Nov. 18, 2019), https://www.pdr.net/drug-summary/Zantac-150-and-300-Tabletsranitidine-hydrochloride-241.3325.

1983; three years later, it became the first drug to total $1 billion in sales.[2]

3.     Zantac is a widely used over-the-counter medication and one of the most popular brands of antacid[3] in the United States.  Sales of Zantac 150 (the over-the-counter tablets containing a 150 mg dose) total $128.9 million annually.[4] Over-the-counter Zantac also is sold in the form of tablets containing a 75 mg dose (Zantac 75).

4.     Zantac's unprecedented sales were possible only because of a deception perpetrated by the drug's manufacturers on consumers who have purchased Zantac since it hit the market in 1983. Sanofi and Boehringer are only the most recent manufacturers to carry out this deception.

5.     Sanofi has owned the U.S. rights to over-the-counter Zantac since about January 2017, and has manufactured and distributed the drug during that period. Previously, Defendant Boehringer owned the U.S. rights to Zantac and manufactured and distributed the drug from about October 2006 to January 2017.

6.     Neither Sanofi nor Boehringer ever disclosed to consumers that the drug has a critical defect: when ingested, Zantac produces in the human body high quantities of NDMA, a chemical that the World Health Organization has described as "clearly carcinogenic."[5] The dangers of NDMA have been publicly known for over 40 years.[6]  NDMA itself belongs to a family of chemicals called

---

[2] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).

[3] Zantac is not technically an antacid because it "works by reducing the amount of acid [the] stomach makes," whereas antacids "neutralize the acid that your stomach has already made." *See Ranitidine, Oral Tablet*, HEALTHLINE (last visited Nov. 18, 2019), https://www.healthline.com/health/ranitidine-oral-tablet. Nonetheless, this Complaint sometimes refers to Zantac as an antacid because this is often how the drug is referred to colloquially. *See, e.g.*, *Leading antacid tablet brands in the United States in 2018, based on sales*, STATISTA (last visited Nov. 18, 2019), https://www.statista.com/statistics/194544/leading-us-antacid-tabletbrands-in-2013-based-on-sales.

[4] *Leading antacid tablet brands in the United States in 2018*, *supra* n. 3.

[5] R.G. Liteplo, *et al.*, *Concise International Chemical Assessment Document 38:*N-*Nitrosodimethylamine*, WORLD         HEALTH         ORGANIZATION         (2002),         *available         at* https://www.who.int/ipcs/publications/cicad/en/cicad38.pdf.

[6] *See, e.g.*, Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL

N-nitrosamines, which the U.S. Environmental Protection Agency refers to as "potent carcinogens."

7.      On September 13, 2019, the FDA issued a statement announcing the presence of NDMA in ranitidine medications, including Zantac.[7] The FDA's notice states that "NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests." Since then, the FDA's own testing "has found unacceptable levels of NDMA in samples of ranitidine."[8]

8.      Several pharmaceutical manufacturers have issued recalls or halted the sale of their ranitidine medications. Pharmacies such as Walgreens, Rite Aid, and CVS have also ceased selling ranitidine medications.

9.      On October 18, 2019, Sanofi issued a voluntary recall of Zantac "due to inconsistencies in preliminary test results" of the active ingredient in Zantac.[9] Despite this, Sanofi's recall notice on the Zantac website continues to direct consumers to a separate, pre-recall notice by Sanofi touting the safety of Zantac. Specifically, the notice states: "The longstanding science supports the safety of Zantac, which has been available over-the-counter for over two decades."[10]

10.     The representations concerning Zantac are false. Zantac contains the carcinogenic impurity NDMA, a chemical that the World Health Organization has described as "clearly

---

(CANADA) (Oct. 11, 1979) ("As one of a family of carcinogens called nitrosamines, NDMA has caused cancer in nearly every laboratory animal tested so far.").

[7] Food & Drug Admin., Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[8] Food & Drug Admin., 10/2/19: UPDATE – FDA Provides Update on Testing of Ranitidine for NDMA Impurities (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[9] Jen Christensen, *Sanofi Recalls Popular Heartburn Medication Zantac OTC*, CNN, Oct. 18, 2019, https://www.cnn.com/2019/10/18/health/zantac-otc-recall/index.html (last visited Nov. 18, 2019).

[10] ZANTAC STATEMENT, https://www.zantacotc.com (last visited Nov. 14, 2019) (click "Read More" on "A Message From Sanofi").

carcinogenic."

11.     The Medicines and Healthcare Products Regulatory Agency (MHRA) of the United Kingdom also issued an alert regarding Zantac, noting recalls issued by companies are "a precautionary measure due to possible contamination of the active substance in Zantac, ranitidine, with the impurity NDMA."[11] "The MHRA has asked manufacturers to quarantine all ranitidine products which may contain the active pharmaceutical ingredient that is potentially affected by this issue."[12]

12.     In the case of Zantac and other ranitidine medications, the cause of the NDMA contamination is still being investigated by the FDA and other regulatory agencies. However, the Health Products Regulatory Authority of Ireland, in issuing a recall of Zantac, has stated, "The reason for the recall is that a nitrosamine impurity has been identified in ranitidine active substance batches manufactured at a manufacturing site in India."[13]

13.     The FDA recently announced a permissible intake limit of 96 ng of NDMA per day.[14] But even this limit may be too high: A public health statement issued 30 years ago by the Agency for Toxic Substances and Disease Registry warned of the dangers posed by NDMA, noting among other things that "high level short-term and *low level long-term exposures* [to NDMA] caused non-

---

[11] Medicine and Healthcare Regulatory Agency, Zantac – MHRA Drug Alert Issued as GlaxoSmithKline Recalls all Unexpired Stock (Oct. 8, 2019), https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock.

[12] *Id.*

[13] Health Products Regulatory Authority, Precautionary Pharmacy and Retail Level Recall of Several Batches of a Number of Ranitidine Medicines in Ireland (Sept. 23, 2019), https://www.hpra.ie/homepage/medicines/safety-notices/item?t=/precautionary-pharmacy-and-retail-level-recall-of-several-batches-of-a-number-of-ranitidine-medicines-in-ireland&id=d26b0c26-9782-6eee-9b55-ff00008c97d0.

[14] FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan), FDA (last updated Aug. 28, 2019) (setting "interim limits for NDMA" and other nitrosamines at 96 ng/day for angiotensin II receptor blockers).

cancerous liver damage and/or cancer in animals [and] also usually resulted in internal bleeding and death."[15]

14. The FDA has established a "permissible daily intake limit for…NDMA of 96 [nanograms]." But Zantac has an NDMA content of between 2.5-2.8 million nanograms per tablet, according to testing by Valisure, an FDA-registered online pharmacy.

15. When the news broke on September 13, 2019 that Zantac exposed users to NDMA, "[g]lobal health regulators sounded a coordinated alarm."[16]

16. Plaintiff has purchased the over-the-counter version of the drug Zantac in Illinois during the relevant period, January 21, 2015 to the present.

17. Plaintiff and the Class were injured by the full purchase price of their Zantac medications. These medications are worthless, as they contain harmful levels of NDMA. As the medications expose users to NDMA well above the legal limit, the medications are not fit for human consumption. Plaintiff is further entitled to statutory damages, damages for the injury sustained in consuming high levels of acutely-toxic NDMA, and for damages related to Defendants' conduct.

18. Had Plaintiff and Class members known that taking Zantac would expose them to high levels of the carcinogen NDMA, they would not have purchased the drug.

19. Defendants' failure to disclose this material information to Plaintiff and Class members violates the laws of Illinois as well as laws in the United States.

20. Plaintiff brings this action on behalf of the Class for equitable relief and to recover

---

[15] Agency for Toxic Substances & Disease Registry, PUBLIC HEALTH STATEMENT FOR N-NITROSODIMETHYLAMINE 2 (Dec. 1989) (emphasis added), available at https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=173. The public health statement also notes that "[s]hort-term or long-term exposure of animals to water or food containing NDMA is also associated with serious effects, such as liver disease and death, at levels ranging from 5 to 50 ppm [parts per million] in water and 5 to 100 ppm in food."

[16] Anna Edney & John Lauerman, *Carcinogen in Zantac and its generics triggers probes by FDA, EU*, THE HAMILTON SPECTATOR (Sept. 13, 2019), https://www.thespec.com/newsstory/9595764-carcinogen-in-zantac-and-its-generics-triggers-probes-by-fda-eu/.

damages and restitution for: (i) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA"); (ii) breach of the express warranty; (iii) breach of the implied warranty; (iv) fraudulent concealment; and (v) fraud.

## PARTIES

### Plaintiff

21.     Plaintiff Denise Guy ("Plaintiff") is a citizen of Illinois who resides in Chicago, Illinois.  During all relevant time periods, Plaintiff purchased and consumed Zantac manufactured by Defendants.  Plaintiff took the drug four times a week to treat acid reflux at times during the relevant period. During the time that she has taken Zantac, Plaintiff has generally purchased Zantac in the form of 150 mg tablets at Walgreens and Walmart stores in Illinois.  Plaintiff spent in excess of $300 on Zantac during the relevant period.

22.     When purchasing Zantac from Defendants, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the medications were properly manufactured, free from defects, and safe for their intended use. Plaintiff relied on these representations and warranties in deciding to purchase Zantac from Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Zantac from Defendants if she had known that they were not, in fact, properly manufactured and free from defects. Plaintiff also understood that each purchase involved a direct transaction between herself and Sanofi because her medication came with packaging and other materials prepared by Defendants, including representations and warranties that her medications were properly manufactured and free from defects.

23.     If Plaintiff had known that taking Zantac would expose her to unsafe quantities of NDMA, she would not have purchased or used the drug.

### Defendants

6

24. Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of the French company Sanofi.

25. Defendant Sanofi US Services Inc. is a Delaware corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of the French company Sanofi.

26. Defendant Chattem, Inc. is a Tennessee corporation with a principal place of business at 1715 West 38th Street, Chattanooga, Tennessee 37409, and is a wholly owned subsidiary of the French company Sanofi.

27. Defendants Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants") controlled the U.S. rights to over-the-counter Zantac from about January 2017 to the present and manufactured and distributed the drug in the United States during that period.

28. Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") is a Delaware corporation with a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877, and is a subsidiary of the German company Boehringer Ingelheim Corporation. Boehringer owned the U.S. rights to over-the-counter Zantac from about October 2006 to January 2017 and manufactured and distributed the drug in the United States during that period.

## JURISDICTION AND VENUE

29. This Court has jurisdiction under 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

30. The Court has personal jurisdiction over each Defendant because each Defendant has

transacted business, maintained substantial contacts, and/or committed overt acts in this District. Defendants' unlawful conduct has injured persons residing in, located in, or doing business throughout this District.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this district, and because a substantial part of the events giving rise to this action occurred within this district.

### DEFENDANTS FAILED TO DISCLOSE TO CONSUMERS THAT ZANTAC EXPOSED CONSUMERS TO HIGH LEVELS OF NDMA, A KNOWN CARCINOGEN, DESPITE SCIENTIFIC STUDIES WHICH ALERTED DEFENDANTS TO THIS FACT

32.     During the time that Defendants manufactured and sold over-the-counter Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. Neither Sanofi nor Boehringer ever disclosed this risk to consumers on the drug's label—or through any other means—nor did Defendants report these risks to the FDA.

33.     Although there were some scientific articles linking ranitidine—the active ingredient in Zantac—to NDMA in the first few years after the drug's U.S. launch, those articles tended to minimize the danger that ranitidine posed to consumers.[17]

34.     During the time that Defendants were manufacturing and selling over-the-counter Zantac in the United States, however, the scientific evidence linking Zantac and NDMA was mounting and should not have been ignored by Defendants.

35.     For example, a 2011 scientific study found that, out of eight pharmaceuticals that

---

[17] *See, e.g.,* Silvio De Flora, *et al.*, *Genotoxicity of nitrosated ranitidine*, 4(3) CARCINOGENESIS 255, 260 (1983) (stating that "the potential risk linked with [ranitidine] use is probably negligible"); J. Meyrick Thomas, *et al.*, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 28 GUT 726, 737 (1987) ("The most important findings of this study are that . . . N-nitroso compound concentration did not increase during prolonged maintenance treatment with ranitidine . . . ."); Jun Matsuda, *Nitrosamines in gastric juice of patients with gastric ulcer before and during treatment with histamine H2-receptor antagonists*, 25(2) GASTROENTEROLOGIA JAPONICA 162, 168 (1990) ("The amounts of NDMA and NDEA found in human gastric juice even when patients were given H2-blockers seemed too small to produce carcinogenesis in a short time in man.").

were observed, "ranitidine showed the strongest potential to form N-nitrosodimethylamine (NDMA)" when present in drinking water during chloramine disinfection.[18] The same study noted that "[r]anitidine gave a much higher yield of NDMA in the present study than reported in [prior] literature."[19] Another 2011 scientific article that examined ranitidine in the water supply also found that the drug was "an important NDMA precursor."[20]

36.    A 2014 scientific article that examined the formation mechanisms of NDMA acknowledged the consensus about the dangers posed by ranitidine, observing that ranitidine and two other pharmaceuticals had "recently caused much concern because they are potent NDMA precursors."[21]

37.    A 2018 scientific review "summariz[ing] major findings over the last decade related to N-Nitrosodimethylamine (NDMA)"[22] again pointed out that ranitidine had a high rate of NDMA formation "upon chloramination."[23]

38.    Despite the undeniable scientific evidence linking ranitidine to the production of high levels of NDMA, Defendants did not disclose this link to consumers on Zantac's label or through any other means.

---

[18] Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010). "Chloramination is the process of adding chlorine to drinking water to disinfect it and kill germs. Chloramination is sometimes used as an alternative to chlorination." *Disinfection with Chloramine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 20, 2015), https://www.cdc.gov/healthywater/drinking/public/chloramine- disinfection.html.

[19] Shen & Andrews, *supra* n. 18, at 948.

[20] Julien Le Roux, *et al.*, *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164, 3165 (Mar. 26, 2011).

[21] Yong Dong Liu, *et al.*, *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVTL. SCI. & TECHNOLOGY 8653, 8660 (June 26, 2014).

[22] *See, e.g.*, Massimiliano Sgroi, *et al.*, *N-Nitrosodimethylamine (NDMA) and its precursors in water and wastewater: A review of formation and removal*, 191 CHEMOSPHERE 685 (Oct. 15, 2017).

[23] *Id.* n. 22, at 698.

39.     Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

40.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety:

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.[24]

41.     The manufacturer's annual report also must contain "[c]opies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product."[25]

42.     Defendants simply ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

43.     Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

### ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT ALLEGATIONS

44.     At all times relevant hereto, the sale of Zantac in Illinois was governed by the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA").

---

[24] 21 C.F.R. § 314.81(b)(2).

[25] 21 C.F.R. § 314.81(b)(2)(v).

45.     The ICFA is a regulatory and remedial statute intended to protect consumers, including Plaintiff and the Illinois Subclass (as defined below), against unfair or deceptive acts or practices.

46.     Specifically, Section 2 of the ICFA prohibits deceptive acts or practices which are committed in the course of trade or commerce and with the intent that others rely upon them. *See* 815 ILCS 505/2, which states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

47.     815 ILCS 510/2(a)(5) of the Uniform Deceptive Trade Practices Act states:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person ... represents that goods or services have... characteristics, . . . uses, [or] benefits . . . that they do not have . . . .

48.     The above-described unfair or deceptive acts or practices occurred in the course of conduct involving trade or commerce, namely, the sale of goods to Plaintiff and the Class.

49.     Defendants' practice of unlawfully engaging in the activity described herein also constitutes "unfair" business acts or practices because, *inter alia*, Defendant engaged in false advertising, which conceals and omits material facts regarding Zantac.

50.     Defendants' business acts or practices therefore offend an established public policy, and Defendants engaged in unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, as alleged in detail previously, and therefore Defendants' actions are unfair or deceptive acts or practices prohibited by Chapter 2 of the ICFA. 815 ILCS 505/2.

11

51.     Defendants intended that Plaintiff and the Class rely on the deceptive acts or practices described herein. Defendants' intent is evidenced by, *inter alia*, the fact that Defendants failed to disclose that Zantac exposed users to unsafe levels of the carcinogen NDMA prior to purchase.

52.     The practices Defendants employed, whereby Defendants advertised, promoted, marketed and sold Zantac without any warning label regarding the exposure to unsafe levels of NDMA are unfair, deceptive and misleading and are in violation of IFCA.

53.     The foregoing deceptive acts and practices were directed at consumers.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of herself and all others similarly situated.

55.     Plaintiff seeks to represent the following Classes:

**The Nationwide Class:** All persons who purchased over-the-counter Zantac in the United States for personal, family, or household use during the Class Period.

**The Illinois Subclass:** All persons who purchased over-the-counter Zantac in Illinois for personal, family, or household use during the Class Period.

56.     For purposes of this action, the Class Period is defined as the period from January 21, 2015 through the present.

57.     Excluded from the Class are each Defendant and any entity in which a Defendant has a controlling interest, as well as any Defendant's legal representatives, officers, directors, assignees, and successors.

58.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. During the Class Period, over-the-counter Zantac was one of the best-selling antacid medications in the United States. Hundreds of thousands—if not millions—of persons purchased the drug. Class members are readily identifiable from information and records

in the possession of Defendants and third-party pharmacies such as CVS, Walgreens, Walmart, and Rite Aid.

59.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants: As a result of Defendants' failing to disclose that Zantac exposed users to unsafe levels of the carcinogen NDMA, Plaintiff and Class members were misled into purchasing Zantac—a drug they otherwise would not have purchased. There are numerous Zantac substitutes; in addition to other H2 blockers such as Pepcid-AC and Tagamet-HB, there are also proton pump inhibitors—for example, Dexilant, Nexium, Prevacid, Protonix, AcipHex, and Prilosec—which "block the enzyme in the stomach wall that makes acid."[26]

60.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

61.     Plaintiff's lead counsel are experienced in the prosecution of complex class-action litigation.

62.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful actions.

63.     Questions of law and fact common to the Class include, but are not limited to:

   a.   Whether the Zantac sold by Defendants exposed Plaintiff and Class members to unsafe levels of the carcinogen NDMA;

---

[26] *How Acid Reducers Can Help Treat Heartburn*, WEBMD (June 10, 2017), https://www.webmd.com/heartburn-gerd/h2-blockers-how-acid-reducers-can-help-treat-gerd- symptoms.

b.  Whether Defendants knew or had reason to know that Zantac exposes users to unsafe quantities of NDMA;

c.  Whether Defendants acted to conceal from consumers that Zantac exposes users to unsafe quantities of NDMA;

d.  Whether Defendants' conduct was knowing or willful;

e.  Whether Defendants notified the FDA that Zantac exposes users to unsafe quantities of NDMA;

f.  Whether Defendants attempted to gain approval from the FDA to change Zantac's label to add a warning that the drug exposes users to unsafe quantities of NDMA;

g.  Whether Defendants acted to conceal from the FDA the link between Zantac and NDMA;

h.  Whether Defendants' failure to disclose on Zantac's label (or elsewhere) that the drug produces high levels of the carcinogen NDMA was unfair, deceptive, fraudulent, or unconscionable;

i.  Whether Defendants are liable to Plaintiff and Class members for damages under state consumer-protection statutes;

j.  When Defendants manufactured and sold Zantac in the United States;

k.  Whether an injunction should be issued requiring Sanofi Defendants to disclose on Zantac labels that the drug exposes users to unsafe levels of NDMA; and

l.  Whether Plaintiff and Class members are entitled to attorneys' fees, prejudgment interest, and costs, and if so, in what amount.

64.     Plaintiff and Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism—including providing injured persons or entities a method for obtaining redress

on claims that could not practically be pursued individually—substantially outweigh potential difficulties in management of this class action. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact also is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class and require court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

65. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

**A. Discovery Rule Tolling**

66. Within the period of any applicable statutes of limitation, Plaintiff and members of the proposed Class could not have discovered through the exercise of reasonable diligence that Defendants were not disclosing the high levels of the carcinogen NDMA produced by Zantac.

67. Plaintiff and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not disclose the high levels of NDMA produced by Zantac. The information linking Zantac to NDMA was contained exclusively in articles that were published in scientific journals. Plaintiff and Class members did not have access to these scientific articles because they were behind a paywall. And even had the articles been more widely available, the significance of these highly technical articles would not have been apparent to Plaintiff or Class members.

68. Plaintiff and Class members could not have reasonably discovered the true extent

15

of Defendants' deception with regard to Zantac's safety until the online pharmacy Valisure filed its citizen petition disclosing the extremely high levels of NDMA produced by Zantac.

69. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.      Fraudulent Concealment Tolling**

70. All applicable statutes of limitation have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's producing high levels of the carcinogen NDMA.

71. Instead of disclosing to consumers the link between Zantac and the carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this information on the drug's label or elsewhere.

**C.      Estoppel**

72. Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the risk of NDMA exposure associated with Zantac.

73. Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Zantac and never updated the drug's label to disclose this risk.

74. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 505/2)**
**(On Behalf of the Illinois Subclass)**

75. Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

76.     This claim is brought by Plaintiff against all Defendants on behalf of herself and the Illinois Subclass.

77.     ICFA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices" in the state of Illinois.

78.     At all relevant times, Defendants conducted business, trade and commerce in Illinois and across the United States.

79.     As described in this Complaint, Defendants conduct constitutes "deceptive" acts or practices in violation of ICFA.

80.     Defendants' practices violated ICFA for, among other things, the following reasons:

> a.     Defendants concealed from Plaintiff and Class members the material fact that Zantac was defective, and as such, was not of merchantable quality.
>
> b.     Defendants failed to disclose material information discussed above regarding the relationship between Zantac and NDMA.

81.     Defendants consciously omitted to disclose material facts to Plaintiff and the Subclass members regarding the defects in Zantac.

82.     Defendants' deceptive conduct described herein includes the omission and concealment of material facts concerning the defects in Zantac.

83.     Defendants intended that Plaintiff and Subclass members would rely on their omissions and misrepresentations so that Plaintiff and Subclass members would purchase Zantac.

84.     Had Defendants disclosed all material information regarding the defects in Zantac to Plaintiff and Subclass members, they would not have purchased Zantac.

85.     The foregoing acts, omissions, and practices proximately caused Plaintiff and Subclass members to suffer an ascertainable loss in the form of, among other things, the money

they paid for Zantac.

86.     Plaintiff and Subclass members are entitled to enjoin Defendants' deceptive practices, and to recover their damages including reasonable attorney fees.

87.     Defendants knew that the Zantac they were manufacturing and distributing was defective and was not suitable for its intended use. Defendants had notice of this fact through numerous scientific articles showing that Zantac produces NDMA. Defendants nonetheless failed to warn Plaintiff and Subclass members about this defect despite having a duty to do so.

88.     By failing to disclose and by actively concealing the defects in Zantac, which they marketed as safe, Defendants engaged in deceptive business practices in violation of ICFA.

89.     In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Zantac.

90.     Defendants' deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety of Zantac.

91.     Defendants intentionally and knowingly misrepresented material facts regarding Zantac with the intent to mislead Plaintiff and Subclass members.

92.     Defendants knew or should have known that their conduct violated ICFA.

93.     As alleged above, Defendants made material statements about the safety of Zantac that were either false or misleading.

94.     Defendants had a duty to disclose to Plaintiff and Subclass members the truth about the safety of Zantac.

95.     Had Plaintiff and Subclass members been aware of the NDMA exposure caused by Zantac, they would not have purchased Zantac.

96.     Defendants' concealment of the defects in Zantac was material to Plaintiff and Subclass members.

97.     Plaintiff and Subclass members suffered ascertainable loss caused by Defendants'

misrepresentations and concealment of and failure to disclose the defects in Zantac.

98.     As a direct and proximate result of Defendants' violations of ICFA, Plaintiff and

Subclass members have suffered injury-in-fact and actual damages, as alleged above.

99.     Because Defendants' deceptive conduct caused injury to Plaintiff and Subclass

members, Plaintiff and Subclass members seek a refund for their purchases of Zantac, together

with appropriate penalties, reasonable attorneys' fees, costs, and any other legal or equitable relief

that the Court deems just and appropriate.

**COUNT II**
**Breach of Express Warranties**
**(On Behalf of The Nationwide Class and the Illinois Subclass)**

100.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs of this Complaint.

101.    This claim is brought against all Defendants by Plaintiff on behalf of herself, the

Nationwide Class, and the Illinois Subclass.

102.    Plaintiff, and each member of the Class and Illinois Subclass, formed a contract

with Defendants at the time Plaintiff and the other Class and Illinois Subclass members purchased

the defective Zantac. The terms of the contract include the promises and affirmations of fact made

by Defendants on Zantac's packaging and through marketing and advertising, including that the

product would contain only what was stated on the label, and not harmful impurities such as

NDMA. This labeling, marketing, and advertising constitute express warranties and became part

of the basis of the bargain, and are part of the standardized contract between Plaintiff and the

members of the Class and Illinois Subclass and Defendants.

103.    Plaintiff relied on the express warranty that her Zantac was safe and would not

contain unsafe levels of NDMA. This express warranty further formed the basis of the bargain,

and is part of the standardized contract between Plaintiff and the members of the Class and Illinois Subclass and Defendants.

104.     Defendants purport, through their advertising, labeling, marketing and packaging, to create an express warranty that the medication would contain only the ingredients stated on the label, and not harmful impurities such as NDMA.

105.     Plaintiff and the Class and Illinois Subclass performed all conditions precedent to Defendants' liability under this contract when they purchased the defective medication.

106.     Defendants breached express warranties about the defective Zantac and its qualities because Defendants' statements about the defective Zantac were false and the defective Zantac does not conform to Defendants' affirmations and promises described above.

107.     Plaintiff and each of the members of the Class and Illinois Subclass would not have purchased the defective Zantac had they known the true nature of the defective Zantac's composition, specifically that Zantac contained elevated levels of NDMA.

**COUNT III**
**Breach of Implied Warranties**
**(On Behalf of The Nationwide Class and the Illinois Subclass)**

108.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

109.     This claim is brought against all Defendants by Plaintiff on behalf of herself, the Nationwide Class, and the Illinois Subclass.

110.     Under Illinois law, a warranty of merchantability is implied in every contract for the sale of goods.

111.     An implied warranty of merchantability is breached when the good or product at issue is defective or not fit for the ordinary purpose for which it is intended.

112.     The Zantac manufactured and distributed by Defendants is and was defective

because it exposes persons who take the drug to high levels of the carcinogen NDMA. Thus, Zantac is defective and not fit for the ordinary purpose for which it is intended.

113. At the time that Defendants sold and warranted Zantac, they knew that Zantac was defective and not fit for the ordinary purpose for which it is intended. Nonetheless, Defendants wrongfully and fraudulently concealed these material facts from Plaintiff, Class members, and the Illinois Subclass. Plaintiff and all of the Class members were therefore induced to purchase Zantac under false or fraudulent pretenses.

114. Because of Defendants' breach of implied warranty, Plaintiff, the Class members and Illinois Subclass members seek a full refund of the purchase price of all Zantac they purchased that was manufactured and distributed by Defendants.

115. As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff, Class members, and Illinois Subclass members have been damaged and request all damages they are entitled to under the Illinois law, as well as any other legal or equitable relief that the Court deems just and appropriate.

### COUNT IV
### Fraudulent Concealment
### (On Behalf of The Nationwide Class and the Illinois Subclass)

116. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

117. The Plaintiff brings this claim against all Defendants on behalf of herself and the Nationwide Class and the Illinois Subclass.

118. Defendants intentionally concealed that Zantac is defective and unsafe because it exposes consumers to high levels of NDMA.

119. Defendants affirmatively misrepresented to Plaintiff, and all of the Class members in advertising and other forms of communication, including standard and uniform material

provided with the drug's packaging, that Zantac had no significant defects and was safe to consume.

120.     Defendants knew about the defect in Zantac when they made these representations.

121.     Defendants had a duty to disclose that Zantac contains a fundamental defect as alleged herein, because the defect created a risk to consumers' health and Plaintiff and all of the Class members and relied on Defendants' material representations.

122.     At all relevant times, Defendants held out Zantac to be free from defects and to be a "safe" drug for consumers. Defendants' touted the many benefits and advantages of Zantac, but failed to disclose important facts related to the defect. This made Defendants' other statements about Zantac deceptive.

123.     Plaintiff, Class members and Illinois Subclass members did not know of the defects in Zantac, and Defendants actively concealed the defect from them.

124.     Plaintiff, Class members and Illinois Subclass members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false, misleading, or incomplete. As consumers, Plaintiff and all Class members and Illinois Subclass members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiff and all Class members and Illinois Subclass members by concealing the true facts about Zantac exposing consumers to high levels of the carcinogen NDMA.

125.     Defendants' false representations and omissions were material to consumers because they concerned a quality of Zantac—safety—that played a significant role in the value of Zantac to consumers.

126.     Defendants had a duty to disclose the Zantac defect because Defendants knew that the defect was not known to or reasonably discoverable by Plaintiff, Class members and Illinois Subclass members.

127. Plaintiff, Class members and Illinois Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed or suppressed facts, in that they would not have purchased Zantac and would have taken other affirmative steps in light of the information concealed from them.

128. Because of Defendants' concealment and suppression of facts, Plaintiff and all Class members and Illinois Subclass members sustained damage because they would not have purchased or consumed Zantac but for Defendants' actions.

129. Plaintiff and all Class members and Illinois Subclass members seek damages, attorneys' fees, costs, and any other legal or equitable relief that the Court deems just and appropriate.

130. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's, Class members' and Illinois Subclass members' rights, in order to enrich themselves. Plaintiff and all Class members and Illinois Subclass members request an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT V
### Fraud
### (On Behalf of the Nationwide Class and Illinois Subclass)

131. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

132. This claim is brought against all Defendants by Plaintiff on behalf of herself, the Nationwide Class, and the Illinois Subclass.

133. As discussed above, Defendants provided Plaintiff and the Nationwide Class and Illinois Subclass members with materially false or misleading information about the Zantac manufactured by Defendants. Specifically, Defendants have marketed Zantac as safe for human

consumption. As indicated above, however, these representations are false and misleading as Defendants' Zantac medications contained elevated levels of NDMA.

134.    The misrepresentations and omissions of material fact made by Defendants, upon which Plaintiff and the Nationwide Class and Illinois Subclass members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and the Nationwide Class and Illinois Subclass members to purchase defective Zantac.

135.    Defendants knew that Zantac was contaminated with this harmful impurity, but continued to manufacture it nonetheless. In 2003, it was "proposed that elevated levels of NDMA in drinking water … may be associated with the drug ranitidine."  Furthermore, a 2016 study by Stanford University found that individuals who took Zantac had "NDMA levels [in their urine] more than 400 times greater than what the FDA considers acceptable."  During that time, Plaintiff and the Nationwide Class and Illinois Subclass members were using the medication without knowing it contained dangerous levels of NDMA.

136.    The fraudulent actions of Defendants caused damage to Plaintiff and the Nationwide Class and Illinois Subclass members, who are entitled to damages and other legal and equitable relief as a result.

137.    As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A. For an order certifying the Nationwide Class and the Illinois Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Nationwide Class and Illinois Subclass and Plaintiff's attorneys as Class Counsel;

B. For an order declaring the Defendants' conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiff, the Nationwide Class, and the Illinois Subclass on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For prejudgment interest on all amounts awarded;

F. For an order of restitution and all other forms of equitable monetary relief;

G. For injunctive relief as pleaded or as the Court may deem proper; and

H. For an order awarding Plaintiff and the Nationwide Class and Illinois Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 21, 2020

Respectfully submitted,

DENISE GUY, individually and on behalf of all others similarly situated,

/s/ Kasif Khowaja .
One of Plaintiff's Attorneys

Kasif Khowaja
The Khowaja Law Firm, LLC
8 South Michigan Ave., Suite 2600
Chicago IL 60603
312-201-0575
312-386-5600
kasif@khowajalaw.com

James X. Bormes
Catherine P. Sons
Law Office of James X. Bormes, P.C.
8 South Michigan Avenue, Suite 2600
Chicago, IL 60603
312-201-0575
312-332-0600
jxbormes@bormeslaw.com
cpsons@bormeslaw.com